UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
FERNANDO LUCINA, GINA PAGADUAN,
ARGIE ANOVA, VIDALITO GALAS,
JOUE GAUZON, JUN NAZARRO and
CRISTITA ONTING, each on their own
behalf and on behalf of all other Seafarers
similarly situated,

                  Plaintiffs,

-against-

CARNIVAL PLC and FLEET MARITIME
SERVICES INTERNATIONAL, LTD.,

                  Defendants.
------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 22 2019 ★
BROOKLYN OFFICE

NOT FOR PUBLICATION
MEMORANDUM & ORDER
No. 17-CV-6849 (CBA) (LB)

**AMON, United States District Judge:**

Plaintiff Fernando Lucina and a group of similarly situated employees of Defendants Carnival PLC and its subsidiary Fleet Maritime Services International, Ltd., who worked aboard the *Queen Mary 2* ocean liner (together, "Plaintiffs"), filed this action on November 22, 2017. (D.E. # 1; see also D.E. # 3 ("Am. Compl").) The Amended Complaint alleges that Defendants failed to pay wages due in violation of the Seamen's Wage Act, 46 U.S.C. § 10313, and New York Labor Law §§ 2, 190(2), 193, 196-d, and 651(5). (Am. Compl. ¶¶ 77–111.) On June 22, 2018, Defendants filed a Motion to Compel Arbitration. (D.E. # 19-1 ("Defs.' Br.").) This Memorandum and Order serves as the disposition for Defendants' motion. For the reasons stated below, that motion is GRANTED.

## BACKGROUND

Plaintiffs have been employed by Defendants as stewards and stewardesses aboard the ocean liner *Queen Mary 2* since at least 2009. (Am. Compl. ¶ 7.) Over the course of their employment, they entered into a series of "similarly-worded Seafarer's Employment Agreements

1

with Defendant Fleet Maritime Services" for periods of eight-to-ten months at a time. (Id. ¶ 19.) Each Plaintiff signed an identical boilerplate declaration stating that these contracts were never explained to them, that they were not permitted to negotiate the terms, and that their principal reason for signing the contracts was to ensure that they could provide for their families. (See, e.g., D.E. # 20-6 ("Decl. of Plaintiffs") at 3–4.) Defendants aver that each time they contracted with Plaintiffs, "Plaintiffs signed two versions of their Employment Agreement – one of which was sent to Defendants and a second copy which was retained by the manning agency in the Philippines." (D.E. # 21 ("Defs.' Reply") at 4.) Plaintiffs declare that when they sign employment contracts with Defendants, they sign "at least four copies." (See, e.g., Decl. of Plaintiffs at 3.) Defendants have provided the Court with three different types of contracts, each allegedly signed by the Plaintiffs before departing on each expedition. Because these contracts are central to this motion, the Court explains in detail the material provisions of each contract offered by the parties.

I. **The POEA Contracts**

In an attachment to Defendants' reply brief and in a supplemental filing, Defendants provided a set of contracts (the "POEA Contracts") as an exhibit. (D.E. # 21-1 ("Second Nield Decl.") Ex. 2-A; D.E. # 24-1 ("Third Nield Decl.") Ex. 1A.) These employment contracts were generally signed a few months before Plaintiffs departed on expeditions on the *Queen Mary 2*. (See id.) The contracts were allegedly "retained by the manning agency in the Philippines." (Defs.' Reply at 4.) Plaintiffs deny having signed these contracts. (D.E. # 26-1 at 7.) They argue that their signatures appear illegible and doctored. (Id. at 9–11.) They also argue that the source of these contracts—a Filipino lawyer named Herbert Tria—is untrustworthy, (D.E. #25 ("Pls.' Supp. Br.") at 4–6), and that he cannot properly authenticate the contracts because he lacks firsthand knowledge of the conditions surrounding their formation, (Id. at 7–9.)

2

The POEA Contracts are titled "Contract of Employment." (Second Nield Decl., Ex. 2-A.) They reflect an employment agreement between Plaintiffs, the "Agent" Singa Ship Management Phils., Inc., and the "Principal/Shipowner" Defendant Fleet Maritime Services International, Ltd. (Id.) Each covers the duration of a single expedition on the *Queen Mary 2*. (Id.) Paragraph 1 of the contract explains the basic terms of the contract, including its duration, the employee's position, basic monthly salary, hours of work, overtime, and more. (Id.) Towards the bottom of the document, Plaintiffs and "the Employer" affixed their signature. (Id.) It is not clear whether "the Employer" refers to Singa Ship Management or Fleet Maritime Services. The POEA Contracts also reflect that they had been "[v]erified and approved by the [Philippine Overseas Employment Administration ('POEA')]." (Id.) In addition, Paragraph 2 of the POEA Contracts reads: "The herein terms and conditions in accordance with Governing Board Resolution No. 09 and POEA Memorandum Circular No. 10, both Series of 2010, shall be strictly and faithfully observed." (Id.)

POEA Memorandum Circular No. 10 is a government document released by the POEA that promulgates a set of "Standard Terms and Conditions Governing the Overseas Employment of Filipino Seafarers On-Board Ocean-Going Ships." (D.E. # 19-6 ("First Nield Decl.") Ex. D.) Relevant here, Memorandum Circular No. 10 contains the following provision:

**Section 29. DISPUTE RESOLUTION PROCEDURES**

In cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If the parties are not covered by a collective bargaining agreement, the parties may at their option submit their claim or dispute to either the original and exclusive jurisdiction of the National Labor Relations Commission . . . or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators.

3

(Id.) Defendants contend that this arbitration provision governs Plaintiffs' employment contracts and requires that this dispute be submitted to arbitration in the Philippines.

## II. The SEA Contracts

In their original submission, Defendants provided another set of contracts (the "Seafarer's Employment Agreements" or "SEA Contracts"). (First Nield Decl., Ex. B.) These contracts were signed by Plaintiffs and Defendants, generally a few days before an expedition on the *Queen Mary 2*. (Id.) The SEA Contracts contain basic terms of employment materially indistinguishable from the POEA Contracts. (Compare First Nield Decl., Ex. B at 15 with Second Nield Decl., Ex. 2-A at 23.) Each of the POEA Contracts appear to correlate to one of the SEA Contracts. Plaintiffs do not contest the authenticity of their signatures on these contracts.

The principal document of the SEA Contracts is entitled "Seafarer's Employment Agreement Part A – Individual Terms." (First Nield Decl., Ex. B.) The contracts contain basic employment information including the employee's name and date of birth, the Defendant's company name, the employee's rate of pay, contracted hours, contract start date and end date. (Id.) Under this basic information is a section titled "6. Terms and Conditions." (Id.) This section contains two provisions material to this motion. First, section 6.1 states, "Collective Bargaining Agreement - Your Employment Agreement is governed by the POEA." (Id.) Second, section 6.2 states, "Standard Terms & Conditions of Employment – Part B of your Employment Agreement is attached setting out all the standard terms and conditions of employment relating to your rank and position, referenced as PART B27." (Id.) Below that, the employees and a company representative signed the contracts. (Id.) The bottom of Part A reads, "Please continue to Part B which sets out the standard terms and conditions applicable to your employment." (Id.)

4

Part B was given to the Plaintiffs before they signed Part A of their employment agreements prior to each expedition. (D.E. # 20-1 ("Lucina Decl.") at 5.) Part B is titled, "Part B – Improvements to Standard Terms and Conditions of Employment Within the POEA Dated 2010." (First Nield Decl., Ex. C at 1.) It continues, "[t]his Part B Addendum sets out improvements to the POEA dated October 2010 that are necessary to ensure compliance with the Maritime Labour Convention 2006. This forms part of your Seafarers Employment Agreement. Other than detailed below, all other Terms set out in the POEA dated October 2010 continue unchanged." (Id.) The remainder of Part B contains modifications to the terms and conditions of Plaintiffs' employment. (Id.) Defendants argue that the reference to the "POEA dated October 2010" and the provision in Part A stating that "Your Employment Agreement is governed by the POEA" incorporates Memorandum Circular No. 10 and its arbitration clause. Memorandum Circular No. 10 is dated October 26, 2010. (First Nield Decl. Ex. D.)

### III. Memorandum Circular No. 10 Standard Terms and Conditions

In response to the direction of the Court at oral argument on December 14, 2018, Defendants also provided Plaintiffs and the Court with copies of the POEA Standard Terms and Conditions contained in Memorandum Circular No. 10 purportedly executed by each of the Plaintiffs and corresponding to each of their trips. (See D.E. # 31-2–31-9; D.E. # 30.) These documents contain the arbitration clause that Defendants seek to enforce against Plaintiffs. Defendants also point to the following language in POEA Memorandum Circular No. 10 that purports to show that the government of the Philippines mandates that every Filipino seafarer must be presented with these terms before departing on an expedition:

> 5. Manning agencies shall ensure that its departing seafarers are given a copy of the processed and approved employment contract, including its improvements if any. Under no circumstances shall seafarers be allowed to leave their respective vessels without a copy of the processed employment contract. Such contract shall be randomly checked at the airports.

5

(D.E. # 32-10.) In response, Plaintiffs deny the authenticity of their signatures for many of the same reasons they denied the authenticity of the signatures on the POEA contracts. (D.E. # 31.)

## LEGAL STANDARD

A court "may direct that arbitration be held in accordance with [an] agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. In deciding whether to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Id. (citing 9 U.S.C. § 4). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techs., Inc. v. Comm. Workers of Am., 475 U.S. 643, 649 (1986).

When a party seeks to compel arbitration pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") and Chapter Two of the Federal Arbitration Act, four basic requirements must be met: "(1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope." Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Intern., Inc., 198 F.3d 88, 92 (2d Cir. 1999). "If a district court finds that these requirements are met, it must order arbitration unless it finds the agreement 'null and void, inoperative or incapable of being performed.'" Cargill Intern. S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1018 (2d Cir. 1993) (citing the Convention, Article II(3)). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 (1983).

## DISCUSSION

Defendants move to compel arbitration in the Philippines on the basis that it is required by the arbitration clause contained in POEA Memorandum Circular No. 10, as incorporated by the POEA Contracts and the SEA Contracts and as signed directly by the Plaintiffs. Plaintiffs oppose Defendants' motion on three grounds. First, they argue that there is no written arbitration agreement between the parties. (D.E. # 20 ("Pls.' Opp'n") at 2–18.) Second, they argue that the arbitration provision operates as an unenforceable prospective waiver of Plaintiffs' claims under the Seamen's Wage Act. (Id. at 18–25.) Finally, they argue that the arbitration provision is null and void because it is unconscionable, having been secured under conditions of duress. (Id. at 25–27.) Each of Plaintiffs' contentions are discussed in turn.

### I. Existence of a Written Arbitration Agreement

Plaintiffs contend that there is no written arbitration agreement between them and Defendants because their signed employment contracts do not contain an express arbitration provision and no arbitration provisions are incorporated into the contracts by reference. (Pls.' Opp'n at 2–10.) Plaintiffs do not dispute that they signed Part A of the SEA Contracts. (Id.) But they do dispute whether they signed the POEA Contracts and Memorandum Circular No. 10, as well whether those contracts are properly authenticated and whether Carnival—a non-signatory—can enforce their provisions. Defendants do not claim that Part A of the POEA Contracts or the SEA Contracts contain an arbitration clause on their face. Instead, they argue that the arbitration provision of POEA Memorandum Circular No. 10 is incorporated in these contracts by reference. (Defs.' Br at 6–8; Defs.' Reply at 3–4.)

## A. The POEA Contracts

The POEA Contracts are identical to contracts signed by the plaintiffs in Pagaduan v. Carnival Corp., 709 F. App'x 713 (2d Cir. 2017). In Pagaduan, the Second Circuit held that "[t]he Contract of Employment [(the POEA Contract)] incorporates the Standard Terms and Conditions [of Memorandum Circular No. 10] and its arbitration provision by reference as a matter of law, foreclosing any material factual dispute." Id. at 716. Based on Pagaduan, if the POEA Contracts are valid and enforceable, Plaintiffs' contracts of employment incorporate Memorandum Circular No. 10's arbitration clause by reference.

Plaintiffs challenge the enforceability of the POEA Contracts on three grounds. First, they argue that they did not sign those contracts. (Pls.' Supp. Br. at 3–6.) Second, they argue that those contracts were not properly authenticated because the lawyer through whom they were introduced lacked firsthand knowledge of their execution. Third, Plaintiffs contend that Carnival cannot enforce the POEA Contracts because it is not a signatory to those contracts. For the reasons stated below, the Court finds that none of these arguments preclude enforcement of the POEA Contracts.

Regarding the first argument, Plaintiffs have submitted an affidavit averring, that "each of us plaintiffs in this case categorically denies having signed any of these one-paged POEA employment contracts." (D.E. # 26-1, at 7.) They note that those contracts are "difficult to read, if not completely illegible," contain "white-out," and have "almost illegible signatures." (Id. at 8–11.) The Plaintiffs' affidavit is insufficient to defeat Defendants' motion to compel arbitration because "[s]omething more than a bald assertion of forgery is required to create an issue of fact contesting the authenticity of a signature." Banco Popular North America v. Victory Taxi Management, Inc., 806 N.E.2d 488, 490 (N.Y. 2004). Here, Plaintiffs have provided nothing more. Although the appended copies of the POEA Contracts are not perfectly clear, all signs point to

8

their authenticity. The contested signatures on the POEA Contracts look very similar to (but not photocopied from) the signatures on the SEA Contracts which Plaintiffs concede are their signatures. (Compare e.g., First Nield Decl. Ex. B, at 5, with Third Nield Decl., at 27.) Further, the signatures for each individual Plaintiff appear to vary from contract to contract within the POEA Contracts, suggesting that they were not copied and pasted. (Compare e.g., Third Nield Decl., at 27 with id. at 28.) In addition, these contracts were stamped with the approval of the Philippine Overseas Employment Agency, a government agency tasked with protecting the rights of Filipino seafarers. The declarations of three individuals versed in Filipino law state that Plaintiffs would have been required by the government of the Philippines to execute copies of the POEA Contract before embarking on any overseas expeditions. (D.E. # 27-2 at 3, 27-3 at 4, 27-4 at 2.[1]) This involvement of the government of the Philippines provides further reason not to doubt the authenticity of Plaintiffs' signatures.

Second, Plaintiffs argue that the POEA Contracts cannot be considered because they were not properly authenticated. (Pls.' Supp. Br. at 6–12.) Specifically, they argue that the individual through whom the contracts were originally offered lacked personal knowledge of their formation, as is required to properly authenticate a document under Federal Rule of Evidence 901. Without commenting on the merits of this contention, the Court notes that any potential infirmities have been remedied by Defendants' December 7, 2018 submission. In that filing, Rene Riel, president of Singa Ship Management Philippines, Inc., swore that "his company . . . has issued the attached POEA-approved employment contracts" and that "[t]hese documents are true and correct copies of documents, retained in the Philippines in the ordinary course of business." (Third Nield Decl.,

---

[1] Plaintiffs moved, in a December 10, 2018 letter, to strike these affidavits and others attached to Defendants' "Supplemental Reply in Support of Motion to Compel Arbitration and/or Dismiss," (D.E. # 27). (D.E. # 28.) The Court declines to strike these filings because they respond to material questions raised in Plaintiffs' November 9, 2018 Affidavit/Declaration. (D.E. # 26.)

Ex. 3 at 3.) This is sufficient to establish the POEA Contracts' authenticity. See Elsevier B.V. v. UnitedHealth Group, Inc., 784 F. Supp. 2d 286, 291–92 (S.D.N.Y. 2011) (noting that documents which "conform[ed] to the same format as other . . . agreements . . . used in the ordinary course of business" satisfied Rule 901).

Finally, Plaintiffs argue that Carnival, as non-signatories to the POEA Contracts, cannot enforce them. (Pls.' Supp. Br. 13–17.) The Second Circuit in Pagaduan, however, concluded that "agency principles dictate that Carnival is a party capable of enforcing an arbitration agreement made by its agents." 709 F. App'x at 717. Plaintiffs attempt to distinguish Pagaduan by arguing that the Defendants have failed to establish a connection between the signatories of the POEA Contracts (either Singa Ship Management or Fleet Maritime Services) and Carnival. However, Defendants established the necessary connection in Rene Riel's affidavit, which avers that Singa Ship Management is an agent of Fleet Maritime, which in turn is a subsidiary of Carnival. (Third Nield Decl., Ex. 3 at 4.) The Court therefore concludes, consistent with Pagaduan, that Carnival can enforce the POEA Contracts.

Because Carnival can enforce the POEA Contracts against Plaintiffs, the holding of Pagaduan requires the Court to conclude that POEA Memorandum Circular No. 10's arbitration clause is incorporated into their employment contracts.[2]

### B. The SEA Contracts

Even if the dispute about the authenticity of the POEA Contracts could not be resolved at this stage of the litigation, the Court nonetheless concludes that Memorandum Circular No. 10's arbitration clause is incorporated by reference into the SEA Contracts. Specifically, Part B is

---

[2] For the same reasons, the Court disagrees with Plaintiffs' arguments, (D.E. # 30), regarding the authenticity of their signatures on the Standard Terms and Conditions contained in Memorandum Circular No. 10, supplied to the Court subsequent to oral argument. (See D.E. # 31-2–31-9.) However, because Plaintiffs have not fully briefed their position on these documents, the Court declines to rest its decision on the direct acceptance of these Terms and Conditions.

incorporated by reference into Part A of the SEA Contracts and Memorandum Circular No. 10 is incorporated by reference into Part B. Plaintiffs do not dispute that they signed Part A.[3]

"A contract may incorporate another document by reference by describing it in such clear and unambiguous terms that its identity can be ascertained beyond reasonable doubt." Pagaduan, 709 F. App'x at 715 (citing Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 47 (2d Cir. 1993)). "Maritime contracts frequently incorporate by reference other documents and industry terms and conditions." Id. (citing Son Shipping Co. v. De Fosse & Tanghe, 199 F2d 687, 688 (2d Cir. 1952)).

Here a short chain connects the SEA Contracts to Memorandum Circular No. 10. Part A of the SEA Contracts states "Part B of your Employment Agreement is attached setting out all the standard terms and conditions of employment relating to your rank and position." (Nield Decl., Ex. B.) That clause incorporates Part B into the SEA Contracts. Part B is titled "Improvements to Standard Terms and Conditions of Employment Within the POEA Dated 2010." (Id.) Part B also states that the "POEA dated 2010" was promulgated in October. (Id.) POEA Memorandum Circular No. 10 is dated October 26, 2010 and is titled "Standard Terms and Conditions Governing the Overseas Employment of Filipino Seafarers On-Board Ocean-Going Ships." (Id.)

Any Filipino seafarer would understand the reference to "the POEA dated October 2010" to refer to the terms and conditions set forth in Memorandum Circular No. 10. Memorandum Circular No. 10 was promulgated in October 2010 and concerns the terms and conditions of Filipino seafarers' employment aboard ocean-going vessels. The SEA contracts concern the exact

---

[3] Plaintiffs do argue that they never signed Part B of their employment agreements and are therefore not bound by any of Part B's provisions. (See Pls.' Opp'n at 4.) However, "[i]ncorporation by reference produces a single agreement out of the incorporated documents and the contract itself." Lamb v. Emhart Corp., 47 F.3d 551, 558 (2d Cir. 1995). As such, "Carnival does not need to prove that [Plaintiffs] signed both the Contract of Employment and the documents incorporated by reference into that contract at the same time." Pagaduan, 709 F. App'x at 717. In any event, the Court notes that Part B does not even contain a signature line. (See D.E. # 19-5.)

11

same subject—the employment of Plaintiffs aboard ocean-going vessels. The reference to the "POEA dated October 2010" comes in that part of the SEA Contract explicating changes to the "Standard Terms and Conditions of Employment"—once again, the exact subject of Memorandum Circular No. 10. Because the SEA Contracts identify Memorandum Circular No. 10 in "clear and unambiguous terms," Memorandum Circular No. 10's arbitration clause is incorporated by reference into the SEA Contracts.

Plaintiffs argue that the "POEA dated October 2010" could refer to any number of documents, ranging from contracts to regulations to implementing guidelines promulgated by the POEA. (Pls.' Br. at 7.) But Plaintiffs have not pointed to any other POEA-promulgated documents that would confuse a reader of the SEA Contracts. The Court has identified other documents promulgated by the POEA, but none of them render the SEA Contracts' reference to the "POEA dated October 2010" ambiguous. For example, no Filipino seafarer would take the phrase to be a reference to Memorandum Circular No. 8 (dated October 6, 2010), which is entitled "Guidelines on the Selection and Deployment of Filipino Au Pairs to Denmark." See POEA Memorandum Circular No. 8, Philippine Overseas Employment Administration (October 6, 2010), http://www.poea.gov.ph/memorandumcirculars/2010/8.pdf, (last visited March 20, 2019).[4]

In sum, the SEA Contracts' reference to the "POEA dated October 2010" must be read in the context of the contract as a whole. Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993). It is contained in a document titled "Seafarer's Employment Agreement." The "POEA dated October 2010" therefore must concern employment and seafaring. The "POEA dated October 2010" reference is also located on a page

---

[4] The Court may take judicial notice of official foreign government–promulgated documents. See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned."); see also In re Vitamin C Antitrust Litigation, 837 F.3d 175, 194 n.13 (2d Cir. 2016) (judicially noting diplomatic communication).

titled "Improvements to the Standard Terms and Conditions of Employment." Memorandum Circular No. 10 is a set of standard terms and conditions of employment. Without identifying another POEA document promulgated in October 2010 concerning the terms and conditions of employment for Filipino seafarers, Plaintiffs fail to establish that the SEA Contracts' reference to the "POEA dated October 2010" is ambiguous. The Court therefore concludes that the reference to the "POEA dated October 2010" incorporates Memorandum Circular No. 10 and its arbitration clause into the SEA Contracts.

* * *

For the foregoing reasons, the Court concludes that the arbitration clause contained in POEA Memorandum Circular No. 10 is incorporated into Plaintiffs' contracts of employment through both the SEA Contracts and the POEA Contracts.

## II. Article II(3) of the Convention

Plaintiffs argue that the arbitration clause cannot be enforced because it is "null and void" under Article II(3) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. (Pls.' Opp'n at 18–27.) "The limited scope of the Convention's null and void clause must be interpreted to encompass only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale." Apple & Eve, LLC v. Yantai North Andre Juice Co., Ltd., 610 F. Supp. 2d 226, 228 (E.D.N.Y. 2009) (internal quotation marks omitted); see also Meadows Indem. Co. Ltd. v. Baccala & Shoops Ins. Services, Ins., 760 F. Supp. 1036, 1043 (E.D.N.Y. 1991).

### A. Prospective Waiver

First, Plaintiffs argue that the arbitration clause is null and void because it operates as a prospective waiver of their statutory right to damages under the Seaman's Wage Act. (Pls.' Opp'n

at 18–25.) Plaintiffs' Filipino-law expert avers that Filipino arbitral tribunals never apply foreign law and that if Plaintiffs are forced to arbitrate in the Philippines, they will have no opportunity to recover under U.S. statutory law. (D.E. # 20-2 ("Gorecho Decl.").) Relying on Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir. 2009), Plaintiffs argue that this "prospective waiver" is a violation of public policy under Article V of the Convention.

Plaintiffs misconstrue Article V. Article V's "public policy" defense applies to the recognition of arbitral awards, not to the enforceability of arbitration clauses. Article V(2) provides that "[r]ecognition and enforcement of an arbitral award may [] be refused" if "recognition or enforcement of the award would be contrary to the public policy of that country." Convention, Article V(2); see also Lindo v. NCL (Bahamas), Ltd., 652 F.3d 1257, 1280 (11th Cir. 2011) ("Article V applies only at the arbitral award-enforcement stage and not at the arbitration-enforcement stage at issue here."). To the extent Plaintiffs attempt to rely on Article V, their protests are premature. The prospective waiver defense applies only where "there [is] no subsequent opportunity for review" and where the Court is "persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies.'" Vimar Seguras y Reaseguros v. M/V Sky Reefer, 515 U.S. 528, 540 (1995) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 638 (1985)). But where, as here, the Court can "retain[] jurisdiction over the case and 'will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the . . . laws [will] be[] addressed,'" there is not cause to invalidate an arbitration clause. Id. (citing Mitsubishi Motors Corp., 473 U.S. at 638).

In any event, even if Plaintiffs' challenge was appropriately before the Court, they have failed to show that the choice-of-law and choice-of-forum provisions in this case "operate[] in

14

tandem as a prospective waiver of a party's right to pursue statutory damages." Mitsubishi, 473 U.S. at 637 n.19. Plaintiffs have offered only a declaration of a Filipino lawyer who states that, "there has been no labor arbiter decision involving Filipino seafarers that [he] know[s] of that applies the laws of another country, much less the U.S. Seaman's Wage Act." (Gorecho Decl. at 12.) Defendants have pointed to at least one Philippine Supreme Court case suggesting that Philippine conflict-of-law principles sometimes permit the application of foreign law by POEA arbitrators. (Defs.' Reply at 7.) Several other circuits have held that choice-of-law and choice-of-forum provisions only serve to invalidate an arbitral award where "the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair." Lindo, 652 F.3d at 1283 (quoting Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1297 (11th Cir. 1998)); see also Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG, 783 F.3d 1010, 1017 (5th Cir. 2015). Here, Plaintiffs have not adequately established that a POEA arbitrator would not apply U.S. law, nor that application of Filipino law would be "fundamentally unfair."

In short, Plaintiffs cannot bring their "prospective waiver" defense at the motion to compel arbitration stage and, even if they could, they have not adequately substantiated that defense.

**B. Duress**

Plaintiffs also argue that the arbitration clause is null and void because it was negotiated under duress. (Pls.' Opp'n at 25–27.) They claim that the contracts were never explained to them, that they were not permitted to negotiate the terms, and that they signed the contracts only to provide for their families. (See, e.g., Decl. of Plaintiffs at 3–4.) Duress can provide grounds to refuse enforcement of an arbitration clause under Article II. Apple & Eve, 610 F. Supp. 2d at 228.

The Restatement (Second) of Contracts § 175 describes duress as follows: "If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim

15

no reasonable alternative, the contract is voidable by the victim." Plaintiffs have not identified any "improper threats" levied by Defendants. To the extent they characterize inclusion of an arbitration clause as a threat, the Court disagrees, given the federal policy favoring arbitration. Moses H. Cone., 460 U.S. at 25; see also Restatement (Second) of Contracts § 176 (explaining when a threat is improper). Nor have Plaintiffs shown that there was "no reasonable alternative" to signing the contract. They have offered no evidence that they had to "succumb to the demands of the wrongdoer or else suffer financial ruin." Wang v. New York Transit, Inc., No. 91-CV-8695 (SAS), 1996 WL 583389, at *5 (S.D.N.Y. Oct. 10, 1996) (citing Sheehan v. Atlanta Int'l Ins. Co., 812 F.2d 465, 469 (9th Cir. 1987)).

\* \* \*

Because Plaintiffs have failed to establish that the arbitration clause in POEA Memorandum Circular No. 10 was "null and void" under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Article II, the Court concludes that the clause is enforceable against Plaintiffs.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Compel Arbitration is GRANTED. The Court retains limited jurisdiction to enforce any award resulting from the arbitration. The parties are directed to file a letter notifying the Court of the results of the arbitration and their intent to enforce any arbitral award before the Court.

SO ORDERED.

Dated: March 21, 2019
Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge

16